FILED

2014 Dec-10  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH E. KING, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:13-CV-1362-CLS |
| | ) | |
| ADTRAN, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDERS

Plaintiff, Joseph King, asserts claims for age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Alabama Age Discrimination in Employment Act of 1997, Ala. Code § 25-1-20 *et seq.* (1975) ("AADEA"), against his former employer, Adtran, Inc.[1]  Plaintiff's complaint also asserts a state-law claim for "negligent and/or wanton hiring, training, supervision and retention."[2]  The case presently is before the court on defendant's motion for summary judgment.[3]  Upon consideration of the pleadings, briefs, and evidentiary submissions, this court concludes that the motion should be granted.

---

[1] *See* doc. no. 1 (Complaint), ¶ 1.

[2] *Id.*

[3] *See* doc. no. 11 (Summary Judgment Motion).

1

# I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

Adtran, Inc., headquartered in Huntsville, Alabama, designs and manufactures telecommunications equipment, and employs approximately 2,500 persons around the world.[4]  The company does not market its telecommunications equipment directly to consumers.[5]  Instead, it sells to other companies that, in turn, sell to consumers.  Adtran refers to this structure as a "sales channel."[6]

Adtran markets its products through two types of sales channels:  a "Network Service Provider" channel and a "Value Added Reseller" channel.[7]  *A Network Service Provider* ("NSP") is a media carrier company (*e.g.*, AT&T) that sells "enterprise products" (*e.g.*, routers and switches) to consumers.[8]  *A Value Added Reseller*

---

[4] Doc. no. 13-2 (Koch Affidavit), ¶ 2.

[5] Doc. no. 13-4 (Koch Deposition), at 12–13.  It is also sometimes referred to as a "distribution channel."  *See, e.g.*, doc. no. 13-2 (Koch Affidavit), ¶ 9.

[6] Doc. no. 13-4 (Koch Deposition), at 12–13.

[7] Doc. no. 13-2 (Koch Affidavit), ¶ 8.

[8] *Id.*  Network Service Providers are sometimes referred to as "carriers."  *See, e.g.*, doc. no. 12 (Defendant's Summary Judgment Brief), at 3.

("VAR") is a company that markets and sells Adtran data communication products and services to consumers.[9]   Adtran's sales employees are expected to develop relationships with Network Service Providers and Value Added Resellers, and to divide their time equally between the two sales channels.[10]

### A.   Joseph King's Employment at Adtran

Plaintiff, Joseph King, was hired into Adtran's sales department as a "channel account manager" in 1996.[11]   He held several sales positions at the company before his 2003 promotion to "Territory Manager for the Southeast."[12]   In that position, plaintiff was responsible for Network Service Provider and Value Added Reseller sales in Alabama, Mississippi, Arkansas, and Florida.[13]   His responsibilities included "territory management," cultivating relationships with Network Service Providers and

---

[9] Doc. no. 13-1 (Plaintiff Deposition), 21–24.

[10] Doc. no. 13-2 (Koch Affidavit), ¶ 9.

[11] Doc. no. 13-1 (Plaintiff Deposition), at 69.

[12] *Id.* at 69–70; doc. no. 15-1 (Exhibit E (January 1, 2004 Performance Appraisal)), at ECF 16; *see also* doc. no. 14 (Plaintiff's Response to Summary Judgment Motion), at 6.  It should be noted that some documents list plaintiff's position as "Enterprise Territory Manager." *See, e.g.*, doc. no. 15-1 (Exhibit E (January 1, 2008 Performance Appraisal)), at ECF 2. "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically. See Atterbury v. Foulk, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009). Bluebook Rule 7.1.4 permits citations to the "page numbers generated by the ECF header."  Wilson v. Fullwood, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing The Bluebook: A Uniform System of Citation R. B. 7.1.4, at 21 (Columbia Law Review Ass'n et al., 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  Wilson, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[13] Doc. no. 13-1 (Plaintiff Deposition), at 10.

Value Added Resellers, and developing new sales opportunities.[14]  Like all sales

employees at Adtran, plaintiff's compensation included sales commissions, the size

of which depended upon his performance in relation to quotas set by his supervisors.[15]

Plaintiff held the position of Territory Manager for the Southeast until his employment

was terminated on March 20, 2012.[16]

The identity of the person who served as plaintiff's direct supervisor during the

time he held the position of Territory Manager for the Southeast is not clear.  It is

undisputed, however, that Tom Koch became one of plaintiff's supervisors on March

23, 2011:  the date on which Koch was promoted to the position of "Director of Sales

for Value Added Resellers in the United States."[17]  Koch's promotion coincided with

Adtran's decision to prioritize the Value Added Reseller sales channel, and to create

a Value Added Reseller-only sales team beginning the following year, in January of

---

[14] Doc. no. 13-4 (Koch Deposition), at 126–127.  Significantly, Plaintiff never received a formal job description from Adtran.  *Id.* at 33.

[15] Doc. no. 13-2 (Koch Affidavit), ¶ 11.

[16] Doc. no. 13-1 (Plaintiff Deposition), at 10, 69.

[17] Doc. no. 13-4 (Koch Deposition), at 18–19.  Plaintiff testified that Tom Koch, who terminated Plaintiff's employment in 2012, was not his direct supervisor.  He testified that Dave Sanford, Director of Sales, was his direct supervisor throughout his employment. *See* doc. no. 13-1 (Plaintiff Deposition), at 54, 191, 199.  He also testified, however, that Tom Koch became his direct supervisor in 2011.  *Id.* at 211–212.  An "Employee Status Change Form," dated January 28, 2008, listed Plaintiff's "Current Supervisor" as Dave Sanford and his "New Supervisor" as Tom Koch.  Doc. no. 15-2 (Defendant's Exhibit "F" (Employee Status Change Form)).  Dave Sanford signed Plaintiff's 2009 and 2010 performance evaluations as "Supervisor," however.  Doc. no. 15-3 (Defendant's Exhibit "G" (January 1, 2009 Performance Evaluation)), at ECF 9.  Koch testified that he became Plaintiff's supervisor in March of 2011, when he became the Director of Sales for Value Added Resellers.  Doc. no. 13-4 (Koch Deposition), at 18–19.

2012.[18]  Director of Sales Dave Sanford also served as plaintiff's supervisor while plaintiff held the position of Territory Manager for the Southeast.[19]  Vice President of Sales Ted Cole served as direct supervisor of both Tom Koch and Dave Sanford.[20]  **B.**

### Plaintiff's Performance Improvement Plan ("PIP")

As plaintiff's immediate supervisor, Tom Koch frequently evaluated plaintiff's performance by reviewing his weekly reports, partner participation data, and sales activity.[21]  During 2011 Koch identified several aspects of plaintiff's performance that concerned him.  First, he determined that plaintiff was failing to meet his Value Added Reseller sales quota.[22]  That concerned Koch, because plaintiff was slated to join Koch's Value Added Reseller-only sales team that was to be established the following year, in January of 2012.[23]  Second, Vice President of Sales Ted Cole informed Koch that one of plaintiff's Value Added Resellers had complained that plaintiff had not been devoting sufficient time to developing a relationship with that company.[24]  Finally, Koch received complaints from an account manager hired to assist plaintiff

---

[18] Doc. no. 13-2 (Koch Affidavit), ¶ 18.

[19] *See supra* note 17.

[20] Doc. no. 13-4 (Koch Deposition), at 16–17.

[21] Doc. no. 13-2 (Koch Affidavit), ¶ 26.

[22] *Id.* ¶ 28.  Plaintiff's Value Added Reseller sales were below 65% of quota in 2008, 2009, and 2010.  Doc. no. 13-1 (Dec. 1, 2011 Letter to Plaintiff), at ECF 124.

[23] Doc. no. 13-2 (Koch Affidavit), ¶ 30.  As previously noted, Adtran sales employees were expected to devote equal time to the Value Added Reseller and Network Service Provider channels. This policy continued until the end of 2011.

[24] Doc. no. 13-2 (Koch Affidavit), ¶ 28.

with sales in Florida that plaintiff "was not returning his calls and not traveling with him."[25]   Based upon those and other concerns, Koch decided to issue plaintiff a "Performance Improvement Plan" (PIP):   a document that identifies areas of an employee's job duties and responsibilities that require improvement, defines clear performance expectations, and specifies a discrete time period within which the employee must meet the performance expectations.[26]   Plaintiff's Performance Improvement Plan was intended to last for sixty days.   Before Koch delivered the document to plaintiff, however, he consulted Frank Humphrey, Adtran's Employment Relations and Compliance Manager, who reviewed the Plan for clarity and fairness.[27]

Koch issued the Performance Improvement Plan to plaintiff on November 17, 2011, and discussed it with him during a telephone conversation that same day.[28] Koch told plaintiff that he had issued the PIP because he wanted plaintiff to raise his sales performance to the level of his peers.[29]   The first page of the plan listed several aspects of plaintiff's performance that Koch found to be inadequate:

- Partner coverage in the Territory.   Feedback from partners

---

[25] *Id.* ¶ 29.

[26] *Id.* ¶ 30; doc. no. 13-3 (Humphrey Deposition), at 18–19; doc. no. 13-4 (Koch Deposition), at 54. It should be noted that, if a sales employee fails to meet his quota, disciplinary action is at the discretion of the employee's supervisors, and, therefore, discipline for failure to meet a quota is not uniform.  *See* doc. no. 13-1 (Plaintiff Deposition), at 96–97.

[27] Doc. no. 13-3 (Humphrey Deposition), at 7, 18, 21–22.

[28] Doc. no. 13-4  (Plaintiff's Exhibit 12 — Performance Improvement Plan), at ECF 85.

[29] Doc. no. 13-4 (Koch Deposition), at 63.

suggesting you're unwilling to work with them.

- Inability to manage accounts in your territory as illustrated by numerous customer problems and lost business without your knowledge (UNA [University of North Alabama], State of Alabama opportunities, Madison County opportunities as examples)

- Not a positive example for others to follow.

- Consistent under performance of Value Added Reseller segment for 2 years.  Performance in 2010 below 71% of plan.  2011 Performance below plan 8 out of the first 10 months

- Not motivated, doesn't demonstrate a positive, optimistic attitude.

- Poor communication skills.

- Lack of demonstrated knowledge of policies or processes: specialization, deal registration, on-boarding partners, ongoing partner lifestyle management.

- Failure to manage time to drive towards strategic goals.  Does not reinforce EN goals and objectives.

- Failure to mentor new hires in territory.

. . . .

The Territory you are responsible for is currently performing not only below plan but well below the national average performance of other Territories in the company.  The data below does not include performance for the State of Florida as it is now directly supported by Troy Corbin.

Doc. no. 13-4 (Plaintiff's Exhibit 12 – Performance Improvement Plan), at ECF 85

(alterations supplied).[30]

The PIP indicated that, as of October of 2011, plaintiff's Value Added Reseller sales were 86.1% of quota: three percentage points below Adtran's national average of 89.1%.[31] The PIP directed plaintiff to match the national average by the end of 2011.[32] It also directed plaintiff to create sales plans for current and potential Value Added Resellers, and to "secure the essential resources to execute" those plans.[33] The document did not address plaintiff's Network Service Provider sales — sales which, at the time, exceeded his quota.[34]

## C.   Plaintiff's Responses to the Performance Improvement Plan

Plaintiff requested in a November 28, 2011 letter addressed to Tom Koch that "the [sixty-day] time line to review and accomplish the PIP be extended to the end of [the second quarter of] 2012, allowing a reasonable time frame [within which] to

---

[30] It should be noted that Koch did not include Florida in his analysis even though, at the time the PIP was issued, Plaintiff remained involved in sales in Florida and continued to receive commissions on those sales. *See* doc. no. 13-1 (Plaintiff Deposition), at 10, 131.

[31] Doc. no. 13-4 (Plaintiff's Exhibit 12 — Performance Improvement Plan), at ECF 86.

[32] *Id.* at 86–87. Significantly, Plaintiff previously had been required to meet short-term Value Added Reseller goals in the first quarter of 2011 due to his poor Value Added Reseller sales in 2010. *See* doc. no. 13-1 (Plaintiff Deposition), at 117.

[33] Doc. no. 13-4 (Plaintiff's Exhibit 12 — Performance Improvement Plan), at ECF 86.

[34] Doc. no. 13-1 (Plaintiff Deposition), at 142–43. Indeed, Plaintiff met his *total sales* quota in 2010, even though his Value Added Reseller sales reached only 64.1% of quota. *See* doc. no. 13-1 (January 1, 2011 Performance Appraisal), at ECF 111; doc. no. 13-1 (December 1, 2011 Letter to Plaintiff), at ECF 124.

accomplish these items."[35]  Koch declined that request in a December 1, 2011 letter to plaintiff.[36]

Plaintiff complained during a December 7, 2011 meeting with Frank Humphrey, Adtran's Employment Relations and Compliance Manager — who, as previously noted, had reviewed the Performance Improvement Plan for clarity and fairness before it was issued to plaintiff — that the document "was essentially a set-up . . . to get an older employee out of Adtran."[37]  Plaintiff also described the document as "pretextual."[38]  He identified during the meeting several younger employees whose Value Added Reseller sales were below quota for the 2011 fiscal year, but who did not receive PIPs:  *i.e.*, Brent Frederick, who reached 62.4% of his Value Added Reseller quota; Stewart Austin, who reached 77.8%; and Andy Solomon, who reached 78.8% of quota.[39]

On some undisclosed date after that meeting, Humphrey advised Koch that he should not meet with plaintiff without a witness present, because Humphrey believed

---

[35] Doc. no. 13-1 (Letter to Plaintiff), at ECF 124 (alterations supplied).

[36] *Id.*

[37] Doc. no. 13-1 (Plaintiff Deposition)), at 128, 151.

[38] *Id.* at 151.

[39] *Id.* at 225; doc. no. 13-4 (Plaintiff's Exhibit 13 — 2011 Sales Team Performance Summary), at ECF 89.  Plaintiff asserts in his brief, with dubious support, that Stewart Austin and Brent Frederick both were under the age of forty during 2011, but Adtran disputes those facts.  *See* doc. no. 14 (Plaintiff's Response to Summary Judgment Motion), at 20, ¶¶ 64–65; doc. no. 18 (Defendant's Reply Brief), at 4, ¶¶ 64–65.

that plaintiff "was heading towards a legal discussion or legal issue."[40]   Koch previously had told plaintiff that he would meet with him in mid-December and mid-January,  to discuss his progress on achieving the objectives outlined in the PIP; but, acting upon Humphrey's advice, Koch never scheduled any such meetings.[41]

Plaintiff detailed his disagreements with ten statements contained in the Performance Improvement Plan in a December 14, 2011 e-mail to Frank Humphrey.[42] Plaintiff did not mention age discrimination in that communication, but, in an e-mail to Humphrey preceding the December 14th message, he wrote:  "I trust that we can mutually work this out and that this PIP is not pre-textual such that there is some underlying cause."[43]

Plaintiff re-iterated his disagreements with the PIP during a conference telephone call with Humphrey and Koch on January 4, 2012:  a call that plaintiff recorded without the knowledge of the other participants.[44]  Plaintiff did not mention age discrimination during that conversation, either explicitly or implicitly (*e.g.*, through the use of legal jargon, such as the term "pretext").[45]

---

[40] Doc. no. 13-4 (Koch Deposition), at 67.

[41] *See id.*; doc. no. 13-1 (Letter to Plaintiff), at ECF 124–125.

[42] Doc. no. 13-1 (Plaintiff Deposition), at 147–49.  That e-mail was requested by Humphrey. *Id.*

[43] Doc. no. 13-1 (Defendant's Exhibit 23 – E-mail Exchange Between Plaintiff and Humhrey), at ECF 126, 128.

[44] Doc. no. 13-4 (Transcript of January 4, 2012 Conference Call), at ECF 90–122.

[45] *See id.*

Despite Humphrey's admonition to meet with plaintiff only when another witness was present — because Humphrey believed that plaintiff "was heading towards a legal discussion or legal issue"[46] — Koch testified that Humphrey never stated directly that King had allege discrimination on the basis of age:[47] *i.e.*, that the PIP "was essentially a set-up . . . to get an older employee out of Adtran."[48]

### D. Huntsville City Schools Account

On some undisclosed date during the sixty-day period of plaintiff's Performance Improvement Plan — *i.e.*, between November 17, 2011 and January 17, 2012 — Adtran lost a potential sales opportunity with the Huntsville City Schools to its primary competitor, Cisco Systems, Inc.  According to Tom Koch, that lost opportunity

> had the potential for $1.1 million in revenue.  This was also critical to ADTRAN since Huntsville City Schools is in the city of ADTRAN's corporate headquarters.  This was also significant because this was within Mr. King's territory.  This was also very concerning because Mr. King failed to notify me, Dave Sanford, or anyone else of any potential issues with obtaining the business or problems that he was encountering in having contact with Huntsville City Schools.  *On multiple occasions in early 2012, Mr. King had communicated that we were going to be able to secure the business and expressed confidence in ADTRAN's ability to do so.  The loss, without any further notification that the potential business was at risk, was very concerning to me.*  This further illustrated to me Mr. King's lack of engagement with ADTRAN's

---

[46] Doc. no. 13-4 (Koch Deposition), at 67.

[47] Doc. no. 13-2 (Koch Affidavit), ¶ 50.

[48] Doc. no. 13-1 (Plaintiff Deposition)), at 128, 151.

overall strategic objectives.

Doc. no. 13-2 (Koch Affidavit), ¶ 49 (emphasis supplied).

**E**.    **Plaintiff's Termination**

Koch made the decision to terminate plaintiff's employment on some undisclosed date prior to February 21, 2012, even though all of the data concerning plaintiff's sales during the sixty-day period of his Performance Improvement Plan would not be available for Koch's review until March 1, 2012.[49]   From the data available at the time Koch made his decision, however, he determined that plaintiff was meeting his Value Added Resellers sales quota.[50]   Even so, Koch stated in the affidavit submitted in support of summary judgment that he had determined that plaintiff "had not met the elements of the [PIP], including what his [Value Added Reseller] partners had done, and likely would not be successful in doing so" by March 1st.[51]   In his deposition, however, Koch testified that he could not point to any specific aspect of the PIP that King had not met.[52]

Koch obtained approval to replace plaintiff from Vice President of Sales Ted Cole and Cole's supervisor, Division General Manager Rick Schaunsman.[53]   He

---

[49] Doc. no. 13-4 (Koch Deposition), at 79; doc. no. 13-3 (Humphrey Deposition), at 63–64.

[50] Doc. no. 13-2 (Koch Affidavit), ¶ 47.

[51] *Id.* ¶ 48 (alterations supplied).

[52] Doc. no. 13-4 (Koch Deposition), at 100–101.

[53] *Id.* at 88.

13

informed Humphrey in a March 11, 2012 e-mail that "everything [was] finally in place for [him] to let Joe King go."[54]

Plaintiff was asked to meet with Humphrey and Koch at Adtran's Huntsville headquarters on March 20, 2012.[55]  The meeting lasted approximately fifteen minutes, and most of the discussion addressed the lost Huntsville City Schools sales opportunity.[56]  It was "obvious" to plaintiff that Koch was "not happy" about losing that account.[57]  Moreover, during his deposition, plaintiff could not recall whether there had been any discussion of his Performance Improvement Plan during the meeting.[58]

At some point, Frank Humphrey asked Tom Koch to leave the room.  When Koch did so, Humphrey informed plaintiff that his employment with Adtran was terminated, "effective immediately."[59]

On the date plaintiff was fired, he was fifty-five years of age.  Tom Koch was fifty years of age, Ted Cole was approximately sixty-one, and Frank Humphrey was

---

[54] Doc. no. 13-4 (Plaintiff's Exhibit 10 (Mar. 11, 2012 E-mail to Frank Humphrey)), at ECF 83.

[55] Doc. no. 13-1 (Plaintiff Deposition), at 14; doc. no. 13-4 (Koch Deposition), at 106–07.

[56] Doc. no. 13-1 (Plaintiff Deposition), at 251.

[57] *Id.* at 25, 252 ("It was obvious in his demeanor and tone or volume of voice.").

[58] *Id.* at 252.

[59] *Id.* at 13.

in his fifties.[60]   Director of Sales Dave Sanford hired David Converse to replace plaintiff.  On the date of his hiring, Converse was forty-six years of age.[61]

## F.   Equal Employment Opportunity Commission Charge and Dismissal

Plaintiff filed a formal "Charge of Discrimination" with the Equal Employment Opportunity Commission on September 13, 2012.[62]  The EEOC issued a "Dismissal and Notice of Rights" on April 23 of the following year, stating that the agency had terminated its investigation of his charge because it was unable to conclude that the information obtained established violations of the civil rights statutes.[63]   That document notified plaintiff of his right to file suit, and this action followed.

## III.  DISCUSSION

## A.   Negligent Hiring, Training, and Supervision Claim

Plaintiff did not address Adtran's contention that he had failed to assert any facts supporting his state-law "negligent and/or wanton hiring, training, supervision and retention" claim, and that summary judgment was, for that reason, due to be entered in defendant's favor on that claim.[64]  Upon consideration of the record, as well

---

[60] *Id.* at 29–30; doc. no. 13-2 (Koch Affidavit), ¶¶ 6–7.

[61] Doc. no. 13-2 (Koch Affidavit), ¶ 52.

[62] Doc. no. 1-1.

[63] Doc. no. 1-2.

[64] *See* doc. no. 12 (Summary Judgment Brief), at 28–29; doc. no. 14 (Plaintiff's Response to Summary Judgment Motion).

as plaintiff's "Statement of Facts," this court concludes that plaintiff has indeed failed to assert any facts supporting that claim.[65]  Accordingly, summary judgment is due to be entered in favor of Adtran.

**B**.   **Age Discrimination**

Plaintiff asserts claims of age discrimination under both the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. ("ADEA"), and the Alabama Age Discrimination in Employment Act of 1997, Ala. Code § 25-1-20 *et seq*. ("AADEA").[66]  However, one section of the Alabama Act explicitly states that a plaintiff cannot simultaneously pursue an age discrimination claim under both federal and state statutes, but must, instead, elect his or her remedies:

> Any person aggrieved may elect to pursue their remedies under Title VII of the Civil Rights Act of 1964 as amended, and the Age Discrimination in Employment Act[,] 29 U.S.C. Section 621[,] *or in the alternative bring a civil action in the circuit court of the county in which the person was or is employed for such legal or equitable relief as will effectuate the purposes of this article*.  *However, if an action is brought in the federal court, any action pending in the state court shall be simultaneously dismissed with prejudice*.  *Further, any party bringing action under this section shall only be entitled to one recovery of damages*.  Any damages assessed in one court will offset any entitlement to damages in any other state or federal court.  In any action, a person shall be entitled to a trial by jury of any issue of fact in any action for recovery of amounts owed as a result of a violation of this article, regardless of whether equitable relief is sought by any party in the

---

[65] Doc. no. 1 (Complaint), ¶¶ 1, 38–44; doc. no. 14 (Plaintiff's Response to Summary Judgment Motion).

[66] Doc. no. 1 (Complaint).

action. Any employment practice authorized by the federal Age Discrimination in Employment Act shall also be authorized by this article and the remedies, defenses, and statutes of limitations, under this article shall be the same as those authorized by the federal Age Discrimination in Employment Act except that a plaintiff shall not be required to pursue any administrative action or remedy prior to filing suit under this article.

Ala. Code § 25-1-29 (1975) (alterations and emphasis supplied). *See also*, *e.g.*, *Collins v. Compass Group, Inc.*, 965 F. Supp. 2d 1321, 1330 (N.D. Ala. 2013) (Kallon, J.) (finding that, pursuant to the foregoing language of the AADEA, claims based upon both that statute and the ADEA are "duplicative"). Accordingly, this court will address plaintiff's claims under only the rubric of the federal ADEA statute.

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The statute protects individuals who "are at least 40 years of age but less than 70 years of age." 29 U.S.C. § 621(a).

Plaintiff has not produced direct evidence of age discrimination. Therefore, he must satisfy the burden-shifting framework for claims based upon circumstantial proofs that was promulgated by the Supreme Court in a trilogy of decisions, beginning with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and finally

17

elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  The analytical framework developed by that trilogy of cases has three steps, the goal of which is that of "progressively . . . sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Hicks*, 509 U.S. at 506 (quoting *Burdine*, 450 U.S. at 255 n.8) (alteration in original).  Under that familiar framework, the plaintiff bears the initial burden of establishing a *prima facie* case of his employer's intent to discriminate on the basis of the plaintiff's age.  If the plaintiff does so, he creates a presumption of intentional discrimination.  To rebut that presumption, the employer must articulate a legitimate, nondiscriminatory reason for the contested employment action.  If the employer shoulders that burden, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See*, *e.g.*, *McDonnell Douglas*, 411 U.S. at 802–05; *Burdine*, 450 U.S. at 252–56.

A plaintiff establishes a *prima facie* case of age discrimination if he proves that: he was a member of the class of persons protected by the Act (that is, individuals between the ages of 40 and 70); he was qualified to perform the duties of his position; he was, nonetheless, discharged; and that he was replaced by a substantially younger person. *See, e.g.*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653,

656–57 (11th Cir. 1998); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207–08 (11th Cir. 1997).

The first three elements of a *prima facie* case are not in dispute.  A plaintiff may satisfy the fourth element — the requirement to show that he was replaced by a substantially younger person — by showing that he was replaced by an employee who was at least three years younger.  *See, e.g.*, *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (citing *Carter v. City of Miami*, 870 F.2d 578, 582–83 (11th Cir. 1989).  Joseph King was replaced by a man who was nine years younger than he.[67]  Accordingly, plaintiff has demonstrated a *prima facie* case of age discrimination.

Adtran articulated two primary reasons for Koch's decision to terminate plaintiff's employment:   plaintiff's failure to meet the requirements of his Performance Improvement Plan; and his inadequate handling of the Huntsville City Schools sales opportunity.[68]  Accordingly, Adtran met its burden of coming forward with legitimate, non-discriminatory reasons for firing plaintiff.

In order to show that an employer's stated reasons are merely a pretext for discrimination, a plaintiff "must demonstrate such weaknesses, implausibilities,

---

[67] Doc. no. 13-1 (Plaintiff Deposition), at 29–30; doc. no. 13-2 (Koch Affidavit), ¶ 52.
[68] Doc. no. 12 (Summary Judgment Brief), at 12–13, ¶¶ 59–60.

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted); *see also, e.g.*, *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994).

Plaintiff has offered substantial evidence that one of Adtran's stated reasons for his termination — *i.e.*, his failure to meet the requirements of his Performance Improvement Plan — is unworthy of belief.[69] Even so, the Eleventh Circuit held in an *en banc* opinion that an employee must show that *each* of the employer's stated reasons for the adverse employment action is pretextual in order to survive summary judgment. *Chapman v. AI Transport*, 229 F.3d 1012, 1024–25 (11th Cir. 2000) (*en banc*); *see also id.* at 1049 (Birch, J., dissenting) ("As a general rule, I agree with the [majority's holding] that, where an employer offers multiple legitimate, nondiscriminatory reasons for its challenged action, the employee must proffer evidence that shows pretext as to *each* of the proffered reasons." (alteration supplied, emphasis in original)). Here, plaintiff has failed to demonstrate pretext as to Adtran's

---

[69] *See, e.g.*, *supra* Part II.E.

second stated reason for his discharge: *i.e.*, his inadequate handling of the Huntsville City Schools sales opportunity.

Plaintiff contends that Adtran's assertion that Koch terminated him because of the loss of the Huntsville City Schools sales opportunity contradicts Koch's testimony that he did not hold King accountable for the loss of that account.[70]  The court disagrees.  Koch testified during his deposition that he faulted plaintiff for *not realizing* that Adtran was in danger of losing the Huntsville City Schools sales opportunity, *and for not involving others in Adtran's corporate hierarchy in an effort to salvage the opportunity*, but not for the loss itself:

> I didn't hold Joe accountable [for the loss of] that opportunity at all.
>
> . . . .
>
> [T]he key is *you can't win them all.  But as long as we don't give up — you know*, *our management has a philosophy that says never lose alone*.
>
> At any point in time if you feel you're going to lose, *it's your responsibility to escalate to the next level and to the next level*.
>
> So if Joe was losing that deal and he knew it, *it would be incumbent upon him to pick up the phone to call me*.

Doc. no. 13-4 (Koch Deposition), at 124-25 (alterations and emphasis supplied).

Later in his deposition, Koch elaborated as follows:

---

[70] Doc. no. 14 (Plaintiff's Response to Summary Judgment Motion), at 4, ¶ 60.

*It wasn't — the fact that that deal was lost* — and again, it was one of those situations where the opportunity was lost.

*It was my perception and my opinion that Joe did not . . . involve anybody other than himself to bring other people in to help win that deal. And it came as a surprise.*

And it was identified by me as . . . another example of where opportunities in our own backyard, which it was real obvious to me and I assume to Joe, too, especially after the Madison County Courthouse situation earlier in 2011 that opportunities that involved Adtran product in the City of Huntsville were . . . very serious losses in the state. And we needed to be all over making sure that people knew what was going on. And if we were — if it was ever an inkling we were going to lose a deal, we had to notify as many people. We had to make sure that we weren't going to lose that deal without making sure everybody else knew in advance.

[I]t was just simply another example in my mind that Joe didn't have a handle on what was happening in the territory.

*Id*. at 154–55 (emphasis and alteration supplied). That testimony is consistent with

the statements from Koch's affidavit that were quoted in Part II.D., *supra*. It also is

consistent with Koch's observation in the Performance Improvement Plan that

plaintiff exhibited poor communication skills and poor partner management.[71]

Plaintiff attempts to show a contradiction in the foregoing stated reason by

pointing out that Adtran Chief Executive Officer Tom Stanton became involved in

discussions with Huntsville City Schools before the company lost the account. The

court sees no reason why that fact casts doubt upon Koch's testimony that King was

---

[71] Doc. no. 13-4 (Plaintiff's Exhibit 12 (Performance Improvement Plan)), at ECF 85.

at fault for failing "to notify [Koch], Dave Sanford, or anyone else of any potential issues with obtaining the business or problems that he was encountering in having contact with Huntsville City Schools."[72]

Plaintiff also has alleged that Adtran's termination of five older employees is evidence of an intent to discriminate on the basis of age.[73] "Even when offered to show pretext rather than a *prima facie* case, 'me, too' evidence is suspect.  To be probative, the other incidents must implicate a common decisionmaker." *Bell v. Crowne Management, LLC*, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012) (Steele, J.) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008)). Koch has testified that he was the direct supervisor to only one of the five employees identified by King:  Chris Volta, whose "employment was terminated after he released confidential information and misrepresented this fact to Ted Cole and [Koch]."[74]  The court finds that Koch's termination of the employment of one older employee, for misconduct unrelated to the circumstances surrounding plaintiff's termination, is not probative of his intent to discriminate on the basis of age.

Plaintiff has presented no other evidence casting doubt upon that stated reason. Accordingly, the court concludes that summary judgment is due to be entered in favor

---

[72] Doc. no. 13-2 (Koch Affidavit), ¶ 49.

[73] Doc. no. 14 (Plaintiff's Response to Summary Judgment Motion), at 21, ¶ 68.

[74] Doc. no. 13-2 (Koch Affidavit), ¶¶ 55–59 (alteration supplied).

of Adtran on his federal age discrimination claim.

## C.      Retaliation

Plaintiff contends that Adtran terminated his employment in retaliation for his complaints of age discrimination, in violation of the ADEA and the AADEA.[75]  As previously noted, the AADEA does not permit the simultaneous pursuit of ADEA and AADEA claims.  *See* Ala. Code § 25-1-29 (1975).  Accordingly, the court will address only King's ADEA retaliation claim.

When, as here, there is no direct evidence of retaliation, courts again employ the burden-shifting analytical framework articulated in *McDonnell Douglas* and *Burdine* to evaluate a plaintiff's circumstantial evidence of retaliation.  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that:  he engaged in statutorily protected activity; he suffered an adverse employment action; and there is a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  If the plaintiff does so, the employer must come forward with a legitimate, non-retaliatory reason for the adverse employment action.  *Holified v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  If the employer does so, the plaintiff then bears the burden of demonstrating that the employer's stated reason is merely a pretextual

---

[75] Doc. no. 1 (Complaint).

excuse for retaliation.  *Id.*

The court need not decide whether King has established a *prima facie* case of retaliation, because it already has concluded that King has not shown that *both* of Adtran's stated reasons for terminating his employment were pretextual.  Accordingly, summary judgment is due to be entered in favor of Adtran on King's retaliation claims.

## IV.  CONCLUSION AND ORDERS

In accordance with the foregoing, defendant's motion for summary judgment is GRANTED, and all claims asserted against Adtran, Inc., are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

**DONE** and **ORDERED** this 10th day of December, 2014.

United States District Judge